## CHADWICK et. al. v. DENNISTON.

(*Circuit Court, S. D. New York.* December 31, 1889.)

SHIPPING—DAMAGE TO CARGO—LIABILITY OF VESSEL OR OWNER.
    Respondent chartered his vessel to M., who subchartered to libelants. Both charters provided that the vessel should not be responsible for delivery of cargo in bad condition, and exempted the owner from liability for the act of God, and all other dangers and accidents by sea, rivers, and navigation. The charterers further agreed to indemnify the owners from all consequences arising from the captain's signing bills of lading. The vessel was loaded with fruit, under a bill of lading which provided as follows: "Loss or damage resulting from the following perils excepted, viz.: Risk of craft, explosion or fire at sea, in craft or on shore, boilers, steam, or machinery, or from consequences of any damage or injury thereto, however such damage or injury may be caused." In proceeding to her destination the vessel's shaft broke, and, while lying in the trough of the sea, the cargo shifted, and was damaged. It appeared that the shaft was of the best material and workmanship, had been frequently inspected, and disclosed no defects, and that there was no negligence on the part of the owners or their employes. *Held,* that neither the vessel nor her owners were liable for the damage to the cargo.

In Admiralty. Libel for damages. On appeal from district court.

### FINDINGS OF FACT.

(1) The British steam-ship Rover was chartered by her owner, Peter Denniston, (under his firm name of Peter Denniston & Co.,) under a charter of affreightment, on June 16, 1885, to the Merritt Fruit Company, and by that company subchartered to the libelants on September 21, 1885. Under these charters, she had made several trips previous to the voyage hereinafter referred to. (2) Both charters contained the following written clause, "Steamer not responsible for delivery of cargo in

bad condition," and exempted her owner from liability for the act of God, and all other dangers and accidents by the sea, rivers, and navigation. They further provided that the captain, although appointed by the owners, shall be under the orders and direction of the charterers, as regards employment, agency, or other arrangements; and the charterers agree to indemnify the owners from all consequences or liabilities that may arise from the captain's signing bills of lading, or in any other wise complying with the same. (3) The libelants, on or about December 7, 1885, loaded the steamer at Puerto Cortez, Honduras, with a cargo of 10,092 bunches of bananas and 42,159 cocoanuts, to be transported to Charleston, S. C., and thereupon the master issued a bill of lading, such as had also been used on previous trips, which contained the following exceptions:

"Loss or damages resulting from &ast; &ast; &ast; any of the following perils excepted, whether arising from the negligence &ast; &ast; &ast; of the master or mariners, or others of the crew, or otherwise however, viz.: Risk of craft, explosion or fire at sea, in craft or on shore, boilers, steam, or machinery, or from the consequences of any damage or injury thereto, however such damage or injury may be caused; collision, stranding, or other perils of the seas," etc.

(4) On December 10, 1885, while in the Florida straits, the steamer experienced very tempestuous weather, with a violent gale and heavy sea, causing her to take much water on board. While thus exposed, and between much pitching, her crank-shaft, operating the propeller, broke. (5) Owing to the fracture of the crank-shaft, the vessel lay in the trough of the sea for nearly 36 hours, while the engineer strapped together the broken parts of the shaft. During this time she rolled heavily. The bins which kept the bunches of bananas in place between decks and in the hold were broken down; and the bananas became more or less bruised and mashed, so as to be greatly damaged on arrival. By reason, also, of the laboring and straining of the steamer while lying in the trough of the sea, and thus taking much water aboard, sea water also penetrated to the cargo, and damaged the same. (6) The engineer having strapped together the broken parts of the shaft, the aft engine was set in motion, and the vessel again proceeded on her voyage, reaching Charleston on December 15th, where she delivered the cargo, damaged as aforesaid, to the libelants. (7) The Rover was built at Dumbarton, Scotland, in 1874. Her tonnage was 431 gross and 270 net. Her engines and machinery were supplied by a firm that stood high in the trade. The subcontractor who forged the shaft had the highest reputation for turning out good work of that kind. (8) The shaft which broke was made of the best scrap-iron, which is considered the best material for the purpose, and was forged in the manner then and now generally in use for the forging of such shafts, namely, by building out the ingot metal in the form of a parallelogram, and then slotting the form out of the solid, so as to avoid a weld at or near the junction of the cylindrical part of the shaft with the web of the crank. The mode of manufacture known as "jumping on," by which the end of a shaft is

welded into the concave surface of its arm, was not followed in the forging of this shaft. (9) The shaft was 25 per cent. larger than required by the board of trade rules for vessels of her size. It had been in use in the Rover ever since her construction, in 1874. Frequent examinations were made and surveys held upon the machinery and shaft by private surveyors, by the board of trade surveyors, by the surveyors to Lloyds, and by the engineers; but no material or substantial defect in the shaft was ever discovered. (10) The broken parts disclosed no substantial defect which in any way conduced to the fracture, or determined its direction or extent. (11) There was no negligence on the part of the owners of said steam-ship, or any of their employes, which contributed to or caused the fracture of the crank-shaft, or the damage to her cargo in consequence thereof. (12) At the dates of the charters, and at the commencement of the voyage upon which her crank-shaft broke, the steamship Rover was in all respects seaworthy, and reasonably fit for the service upon which she was about to embark.

## CONCLUSIONS OF LAW.

(1) The Rover is not, nor are her owners, responsible for the damage to the fruit; it not appearing that the same was caused by her unseaworthiness, or by the negligence of her owners, or of any of their employes. (2) There should be a decree for the respondent, with costs of both courts.

*Wm. W. Goodrich,* for libelants.

*E. D. Convers,* for respondent.

LACOMBE, J., *(after stating his findings and conclusions as above.)* In affirming the decision of the district judge, nothing need be added to his exhaustive discussion of the law and the facts of the case as presented to him. The additional testimony taken in the court by the respondent fully establishes the identity of the crank-shaft, while it reiterates and supplements the positive statements of those who actually forged such shaft as to the process of manufacture used by them. Against such testimony the further evidence of the expert Burr, substantially to the effect that he believes it was not made in the way described by those who forged it, and that, in his opinion, the district judge was mistaken as to the evidential value of 11 years of good service, is not sufficiently persuasive to call for a reversal.